2014 BNH 006   Note: This is an unreported opinion. Refer to LBR 1050-1 regarding citation.

_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:                                                                                  Bk. No. 13-10366-JMD
                                                                                        Chapter 13
Kathleen Searle,
        Debtor


State of New Hampshire,
Department of Employment Security,
        Plaintiff

v.                                                                                      Adv. No. 13-01051-JMD

Kathleen Searle,
        Defendant

*Richard J. Lavers, Esq.*
*Concord, New Hampshire*
*Attorney for the Plaintiff*

*Mary F. Stewart, Esq.*
*Mary Stewart Law, PLLC*
*Concord, New Hampshire*
*Attorney for Debtor*


**MEMORANDUM OPINION**


I. INTRODUCTION

In this adversary proceeding, the plaintiff, the State of New Hampshire's Department of Employment Security (the "Department") claims that the defendant, chapter 13 debtor Kathleen Searle (the "Debtor") was overpaid $14,666.71 of unemployment benefits in violation of New

Hampshire RSA § 282-A:164 and that the Debtor's conduct in receiving these overpayments constitutes grounds for rendering that debt nondischargeable under 11 U.S.C. § 523(a)(2)(A).[1] The Debtor argues that the debt is dischargeable because she did not act with fraudulent intent and because the Department did not justifiably rely on information that she provided during the benefit application process.  The Department and the Debtor presented evidence to support their positions at trial.  At the trial, the parties agreed that the only contested issues for the Court to determine were whether (1) the Debtor acted with the requisite intent and (2) whether the Department justifiably relied on the information provided by the Debtor.  After consideration of the evidence and the arguments of the parties, the Court finds in favor of the Department and determines the debt to be nondischargeable under § 523(a)(2)(A).

The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334, 157(a), and U.S. District Court for the District of New Hampshire Local Rule 77.4(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

**II. FACTS**

The Court held a half-day bench trial on the Department's complaint.  Two witnesses testified, the Debtor and Christina Cooper, an employee of the Department and a fraud investigator who worked on the Debtor's case.  The following factual background comes from the testimony of the witnesses and the documentary evidence admitted at trial.  Where appropriate, the Court takes judicial notice of the docket.  During the period of time from

---

[1] Unless otherwise stated, all references to "§" or "section" refer to title 11 of the United States Code, hereinafter the "Bankruptcy Code."

October 2009 to October 2011, the Debtor received unemployment benefits from the Department.  The Debtor worked two part-time jobs during this period, one as a substitute teacher at the Laconia School District and the other as a administrative assistant at the Laconia Housing Authority.  The Debtor also testified that she occasionally worked side jobs, such as babysitting for friends.  There is no evidence in the record to indicate how extensive these side jobs were, or how much income the Debtor earned from them.

When the Debtor first applied to the Department for unemployment assistance, she testified that she was asked a number of questions about how much she earned and the extent of her employment.  The Debtor testified that she truthfully conveyed the information about her current jobs to the Department.  An employee of the Department, whose name the Debtor did not recall, explained the general process of applying for benefits to the Debtor.  The Debtor learned that she would need to apply for assistance on a weekly basis and that based on how much she earned, the amount of benefits she received would go up or down, depending on her financial need.  The Debtor also testified that she did not receive a paper copy of the Department guide on unemployment benefits that was supposed to be provided to each applicant.

The Debtor was required to fill out certifications (the "Certifications") each week that she wished to apply for financial assistance.  These Certifications were completed online and asked a number of questions of the Debtor, such as "During the week claimed, were you available for work?" "Did you refuse work?" and "Did you work or perform any services, including self-employment last week? Regardless of whether or not you have been paid for the work or services."  Ex. 8. (Certifications filed by the Debtor for weeks ending October 13, 2009 through May 21, 2011).

If the Debtor indicated that she did perform work she was then asked to provide the number of hours worked, the "gross earnings (before taxes and deductions) for the week claimed" and whether the "earnings amount" provided included "the earnings from all employers you worked for during the week claimed."  If the Debtor answered that she had not reported all her earnings for the week claimed, the Certifications stated that the Department would not provide benefits until the information was provided.  Finally, the Certifications included a follow-up question that enabled the debtor to report non-wage income: "During the week claimed, did you receive any monies not previously reported to this department, other than wages for hours actually worked?"  Id.

After all of the preceding questions had been answered the Debtor was required to certify the accuracy of her answers by reading the following statement:

> "CERTIFICATION: I understand the answers I give to the above questions may affect my rights to benefit payments.  I certify that these statements are true and correct and I am not claiming any benefits from any other unemployment program for the above week.  I understand the law provides penalties for false statements."
> Id.

After reading this statement the Debtor was required to click an "Agree" button to complete the Certifications.

The parties do not dispute that the Debtor reported $2,473.65 in earnings—via the Certifications—during the period in which she received unemployment benefits from the Department.  They also do not dispute that the Debtor's gross earnings actually amounted to $13,914.11 during this time.  See Ex. 7 at 4.  Throughout her testimony, the Debtor asserted that at the time she was completing the Certifications, she thought she was filling them out correctly, despite also knowing that she was not including all her earnings in the Certifications.

The Debtor provided an explanation for this apparent inconsistency. She testified that when she initially applied to the Department for aid she was told that she only needed to report her gross earnings over $350 in the Certifications. The Debtor stated that during each week she applied for benefits, she applied this $350 rule, rather than following the specific written instructions in the Certifications. The Debtor admitted that after her initial meeting with the Department where she learned about the $350 limit, she did not hear about it again. The Debtor agreed that no such rule or limit appeared in the Certifications.

The Debtor did not consistently explain the $350 rule or limitation in her testimony. At various times she referred to the process as "keeping the combined benefit and gross earnings amount under $350," reporting "gross earnings over $350," reporting the "net over $350," and reporting enough income such that she received only what she "needed to live and still be within the law."

At trial, the Department presented a "Summary of Alleged Fraudulent Weeks" (Ex. 7) (the "Summary"), listing for each week the amount of (1) earnings reported by the Debtor, (2) payment received by the Debtor from the Department, (3) hours worked in a given week, and (4) the actual amount of gross earnings received by the Debtor in a given week. The parties agreed that the numbers in the Summary were an accurate representation of these amounts for each week that the Debtor applied and received benefits from the Department. The Department was able to obtain the Debtor's actual earnings because it receives reports from employers in New Hampshire containing this information, including the Debtor's employers.

The weeks contained in the Summary are not consecutive. The Debtor explained this by stating that she did not apply for benefits every week, either because she was not working (the

5

Debtor testified that she thought she had to work in a given week to receive benefits) or because she earned enough not to have to apply for benefits. The Summary shows that for every week the Debtor applied for benefits, she did not once report the actual amount of her gross earnings to the Department. The Summary also does not reflect a consistent reporting methodology on the part of the Debtor.

  For example, in the week ending 10/10/2009 (the first week the Debtor received benefits), the Debtor earned $65, reported no earnings, and received $231 in benefits. Whereas in the final week she received benefits, the week ending 10/08/2011, the Debtor earned $259, reported $120 in earnings, and received $111 in benefits. Indeed, the inconsistency in reporting is even more apparent in weeks where the Debtor earned the same amount, but reported different amounts to the Department. For example, in the week ending 12/25/2010, the Debtor earned $195 and reported no income, while in the week ending 01/08/2011 the Debtor earned the same amount but reported $65 to the Department.

  Some consistency is evident in the Debtor's reporting methodology. For example, when the Debtor earned $65 or less, she reported no income. See, e.g., Ex. 7, weeks ending 10/10/2009, 12/12/2009, 11/27/2010, and 01/15/2011.

  However, there is more inconsistency than consistency in the way the debtor completed the Certifications. In the weeks ending on 12/26/2009, 03/13/2010, and 06/05/2010 the Debtor earned $130, but reported $120, $65, and nothing respectively. During her testimony the Debtor was not able to explain these discrepancies and reiterated that she thought she was doing the right thing at the time and only received enough in benefits so that she could get by.

Similarly, the application of the Debtor's $350 rule or limit is not apparent in looking at the Summary. For example, in some weeks the Debtor earned more than $350 when the amount of benefits received is added to the amount the Debtor actually earned. In the week ending 05/29/2010, the Debtor earned $260 and received $231 in benefits, which means at the end of the day she took home $491 for that week, an amount greater than $350.

And, for some weeks, even if the reported earnings are subtracted from the sum of benefits received and actual earnings, a number greater than $350 results. In the week ending 12/19/2009, the Debtor earned $325, received $228 in benefits, and reported $65 in earnings—subtracting the amount reported from the sum of earnings and benefits, yields $488. The Debtor was not able to explain how the $350 rule applied when she filed these Certifications.

The Debtor did present evidence showing that she was paid on a bi-weekly basis for her job at the Laconia School District. The Debtor did not, however, present a coherent account of how, if at all, this bi-weekly pay period affected the amounts reported in her certifications.

During early Fall of 2010, the Debtor completed the process for obtaining extended unemployment benefits. This process entailed the Debtor meeting with several employees of the Department and answering a series of questions about her jobs and earnings. The Debtor testified that the employees had "everything" in front of them at this meeting—no specific evidence was presented as to what "everything" was—and none of these employees told the Debtor that she was doing anything wrong in filing her Certifications. The Debtor claimed that at this point the Department should have had sufficient information to be able to tell that she was

under-reporting her earnings. Nevertheless, the Department did not discover the problem and approved the Debtor for extended unemployment benefits.

Christina Cooper, the employee in charge of the Department's fraud unit, testified about the investigation that lead the Department to discover the Debtor's false Certifications. Cooper testified that the Department discovered discrepancies in the Debtor's actual and reported earnings in October of 2011 during an internal review—which means that an employee of the department discovered the problem.

Cooper also testified that there was no $350 limitation or rule (as the Debtor explained that concept in her testimony) in the Department's procedures or informational materials at any time during which the Debtor was filing Certifications. To the contrary, each benefit check that the Debtor received directed her to accurately report all of her income.

Once the investigation began, Cooper testified that she personally informed the Debtor that she was being investigated for fraud relating to overpayment of unemployment benefits. Cooper described the Debtor's reaction in detail, stating that she was very distraught, but was still able to respond to Cooper's inquires. Specifically, once Cooper asked the Debtor about the discrepancies between actual earnings and earnings reported via the Certifications, the Debtor responded by stating that she did not think she had to report "per diem" income, without mentioning the $350 limitation. During her testimony, the Debtor did not recall saying anything about per diem income to Cooper. Cooper also testified that the Debtor apologized for incorrectly reporting her earnings and said that he had done "something stupid" and that she was "barely able to support her family."

On October 18, 2011, the Department issued six determinations of fraudulent unemployment compensation pursuant to New Hampshire RSA § 282-A:164.  Exs. 1 - 6.  These determinations effectively required the Debtor to pay back all the benefits she had received, with interest, in total an amount of $14,666.71.

At the conclusion of the trial, the Court directed the parties to submit post-trial briefs, specifically on two issues: (1) how the Debtor's $350 rule applied, including a specific demonstration of the Debtor's methodology and (2) whether the Department justifiably relied on the Certifications, especially in light of the Debtor's application for extended unemployment benefits in early Fall of 2010.  After the parties submitted their briefs, the Court took the matter under advisement.

### III.  DISCUSSION

The issue before the Court is whether the $14,666.71 in overpaid unemployment compensation is a nondischargeable debt within the meaning of § 523(a)(2)(A).  This provision provides:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

To establish that a debt is nondischargeable under § 523(a)(2)(A), a creditor must satisfy six elements: the debtor (1) made a false representation, (2) with fraudulent intent or "scienter", (3) with the intent that the creditor rely on the misrepresentation, (4) actually inducing reliance, (5) that such reliance was justifiable, (6) causing damages.  Palmacci v. Umpierrez, 121 F.3d 781,

9

786 (1st Cir. 1997).  Here the parties only came to trial contesting elements (2) and (5), i.e., the Debtor's intent and the Department's justifiable reliance.  The Department bears the burden of proof on these elements and must carry that burden by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 286 (1991).  The Court deems all other elements established per the agreement of the parties.

In determining the issues here, the Court keeps in mind that the exception to the discharge contained in § 523(a)(2)(A) must be narrowly construed, just as all other exceptions to the discharge.  In re Schifano, 378 F.3d 60, 66 (1st Cir. 2004) (citing Palmacci, 121 F.3d at 786).

    A.    Fraudulent Intent

In order to satisfy the element of fraudulent intent, the Department must show that the Debtor actually intended to mislead it in filing the Certifications.  "Fraudulent intent requires an actual intent to mislead, which is more than mere negligence."  Palmacci, 121 F.3d at 788.  "An honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit . . . A dumb but honest defendant does not satisfy the test of scienter."  Id. (citations omitted).  The unreasonableness of a debtor's stated belief may, however, serve as evidence of fraudulent intent when supported by the totality of the circumstances.  Id. at 789.  Here, the Court must determine whether the Debtor's testimony that she believed she was filling out the Certifications correctly was honest, or if that belief was so reckless as to imply bad faith.

In her testimony, the Debtor relied entirely on the $350 rule to explain her belief that she was filling out the Certifications correctly.  Considering the totality of the circumstances, the Court finds that explanation unreasonable and lacking credibility.  The evidentiary record,

primarily the Debtor's own testimony, provides no credible explanation or consistent application of the so-called $350 rule on which the Debtor claims she relied.

The Department has carried its burden to demonstrate that the Debtor acted with intent to defraud. It presented evidence that the Debtor filled out 69 Certifications, each containing several questions that directed the Debtor to include all of her actual earnings for the week in question. There was no mention of $350 on any of these forms. The Department also presented evidence that each benefit check the debtor received exhorted the Debtor to accurately report her earnings. It is undisputed that the Debtor did not accurately report her earnings in any of the Certifications and that the Debtor was aware the number she was reporting was not the entirety of her earnings for any of the 69 weeks in question—it was necessary for the Debtor to make this admission to advance her $350 theory.

Further, there are the Debtor's inconsistent statements to the Department's fraud investigator. The Debtor told the investigator, when first confronted, that she thought she did not have to report "per diem income"; there was no mention of the $350 limitation. It is reasonable to believe that if the Debtor had actually been following such a rule for two years, it would be the first explanation she provided to explain her conduct.

Finally, the Debtor was unable to demonstrate the alleged $350 rule or limitation in practice, either in her testimony or in her post-trial brief. The Court was not able to discern any pattern in the Debtor's income-reporting strategy. Indeed, the Court cannot see how any consistent explanation could be provided, given that the Debtor actually earned the same amount for numerous weeks, but reported different amounts for many of those same periods. The Debtor was unable to explain these specific discrepancies when confronted with them at trial. The

necessary implication of the Debtor's theory of the alleged $350 rule is that she alone determined what earnings counted towards the rule, without disclosure to the Department. Nothing in the evidentiary record beyond the Debtor's allegations supports such a rule.

Given the affirmative evidence presented by the Department, namely the Certifications and the Debtor's admission that she was aware of the difference between her actual and reported income during the 69 weeks in question, and the lack of a plausible explanation to the contrary, the Court finds the scienter requirement of § 523(a)(2)(A) satisfied by a preponderance of the evidence.

B.  Justifiable Reliance

In order to carry its burden, the Department must demonstrate that it justifiably relied on the Certifications presented by the Debtor in providing her with unemployment benefits. In proving justifiable reliance, a creditor must demonstrate that it did not rely on representations which it knew to be false or which were obviously false at the time of the reliance. Sanford Inst. for Sav. v. Gallo, 156 F.3d 71, 74-75 (1st Cir. 1998); In re Aoki, 323 B.R. 803, 815-16 (B.A.P. 1st Cir. 2005). This standard is best explained by stating what a creditor is not required to do. A creditor is not required to carry out an investigation into whether the debtor's representation is true. "This rule applies whether the investigation would have been costly and required extensive effort or could have been made without any considerable trouble or expense." Sanford, 156 F.3d at 75 (quotations omitted).

The Department has demonstrated that it justifiably relied on the representations of the Debtor in the course of providing her with unemployment benefits. The Department presented the Debtor's Certifications for each of the weeks she received benefits. There is no evidence that

the Department had any reason to disbelieve the information contained in the Certifications when it received them. Cooper, the Department's employee, testified that there was no system for cross-checking the Certifications with the employer-reported, actual earnings until 2013. This new system was established only with federal aid, and at considerable effort—and at any rate was well outside the relevant time period.

The Debtor has attempted to cast doubt on whether the Department justifiably relied on the Certifications by testifying about an interview that occurred in the early Fall of 2010. This is when the Debtor applied for an extension of unemployment benefits. The Debtor testified that the Department employees with whom she interviewed "had everything in front of them" and in her view should have been easily able to see that she was not correctly reporting her earnings. There is, however, no evidence of exactly what the Department employees had in front of them at this interview. The Court infers that the Debtor meant both the Certifications and employer reports of actual income. Aside from the Debtor's testimony, the Court knows nothing about the information or the format it was presented in. If the Department employees did have "everything" in front of them in Fall 2010, the Court finds that it would more likely than not have required at least a "cursory investigation" to determine that the Debtor was not accurately reporting her earnings, given the general nature of the documentary evidence filed in this case. The Court also relies on Cooper's testimony that the Department did not conduct cross-checks of Certifications and employer reports during 2010. The controlling case law in this Circuit does not require the Department to have preformed even a cursory investigation when relying on the Debtor's statements. The Department was reasonable in its reliance on the Debtor's periodic certifications made substantially contemporaneously with its payment of benefits to the Debtor.

## IV.  CONCLUSION

For the foregoing reasons the Court finds the $14,666.71 the Debtor owes to the Department to be a nondischargeable debt within the meaning of 11 U.S.C. § 523(a)(2)(A).  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Date:   April 10, 2014                                              /s/ J. Michael Deasy
                                                                    J. Michael Deasy
                                                                    Bankruptcy Judge